Warning, Hudson v. DeHaan, Appeal No. 23-2395. All right, and I see we have Mr. Held Remote and Mr. Trombley at the podium. When you're ready. May it please the Court, Peter Trombley for the appellant, William Hudson. Mr. Hudson's trial was a he-said, they-said contest about whether Mr. Hudson truly intended to carry out murder or arson for hire. By the time his case went to the jury, his sister, Dana Hudson, was one of the main characters in that trial. The jury never heard from Dana. His trial counsel conducted a cursory investigation that left him unable to evaluate Dana's testimony and her ability to contribute to and corroborate her brother's defense. As a result, the only person other than Mr. Hudson himself who could have spoken to what was going through his mind never spoke to the jury. In a knife-edge case like this one that turns on intent and credibility, there's no reasonable argument for not thoroughly investigating Dana's testimony, and there's no way to be confident that a jury that heard the evidence at trial, plus Dana's testimony, would reach the same result. Because Mr. Hudson has shown both deficient performance and prejudice under Strickland, we ask that you grant Mr. Hudson's petition. Now I want to start with Attorney Burkos' investigation in this case. This is one of many cases where a petitioner is asking a court to find that an investigation was too cursory, was too truncated, to satisfy Strickland. And there are a number of cases from the Supreme Court and from this court that show the path of how a court rules in a petitioner's favor on this. Strickland deference is not something that is an insurmountable hurdle. So we point you, you know, quickly I'll rattle off the names of those cases and I'll talk a little bit in detail about them. Wiggins v. Smith from the Supreme Court is where we'd start. Next, this court's decision in Stitz v. Wilson. This court's decision in Blackman v. Williams. This court's decision in Ragoza v. Hulick. And this court's decision in Mosley v. Atchison. Now, Wiggins involved a defendant who was tried for a death penalty offense, and counsel had reviewed certain social services records that indicated that there might be abuse in the defendant's past, that there was a reason to look further and conduct a social history analysis of the defendant in order to argue against the death penalty in that case. But defense counsel for the petitioner in that case never conducted that social history. Instead, they stopped their investigation at what they had reviewed so far. That's exactly what happened here. Defense counsel, it's not disputed, obtained Dana's correspondence from her brother, and that was at Mr. Hudson's direction that Dana send that correspondence to Mr. Burkos so he could evaluate it and use it at trial. But Mr. Burkos, instead of going further and asking Dana, tell me everything that you know, tell me what precisely you would say about your brother's actions during this time period, what you were doing based on those conversations, and what you thought your brother was doing, Burkos said, I have the letters, I know the substance of what you would say. That left out an entire category of evidence in this case that wasn't covered by the letters, which were phone calls between the defendant and his sister. Now, those phone calls included statements calling Mr. Seale, the government's informant in this case, a chump and a peon. Mr. Hudson did not respect Seale is the conclusion that Dana drew, and you can find that at A991 through A994 in her affidavit she gave in this case. Now, the government disputed that characterization at a trial. They disputed it up through closing arguments at page 620 of the record. They tried to challenge whether Hudson liked Seale, whether they were friends. At A205 in the record, Seale says, yeah, Hudson thought I was his friend. That's why we were talking about committing these heinous crimes together. Hudson's account was that he never trusted Seale, that he was always playing him for money. He was looking for an opportunity to get money out of him to take it and use it for his sister and him to start a new life together in Chicago. So the state in this case is asking the jury to believe that a defendant is going to commit serious crimes that right after he leaves prison would make him a fugitive from justice once again on behalf of somebody who he doesn't like, doesn't trust, and doesn't respect and who he repeatedly lied to in this case, including about Dana and her whereabouts and whether she was safe in Chicago. So Dana could have spoken to this issue. She's the only other person who could have said how Mr. Hudson thought about Mr. Seale, who's supposedly his co-conspirator in these murders. Now, I would turn next to Stitz, which says it's clearly established law that when you're talking about whether an investigation is reasonable, it's not a something or nothing proposition. Some investigation can be too little if you stop. Can you tell me what else is in that category from your perspective of evidence that was in dispute at trial that Dana could have spoken to? So you've given us one clear example, which is what Hudson really thought about Seale. What else is in that bucket from your perspective? Right, Your Honor. So Dana's discussion of what Mr. Hudson's letters meant to her about why he was taking these actions with respect to Seale, from the very start of Mr. Hudson's introduction of her sister to Seale, he says, I found somebody who might be a solution to your financial problem. And at issue in this case was whether Hudson, after he left prison, was going to commit murders on Seale's behalf, to commit arson on Seale's behalf, or whether he was trying to go to Chicago and eventually relocate there with his sister. Do we have to take into account Dana's testimony at the Mockner hearing that she didn't know anything about any scam? And I'm paraphrasing her exact words. Right. Yeah, she didn't know anything about any scam, and so therefore could not have testified to that. So the comparison that you'll need to do to figure out what she said, she said it. A-924 through 929, my brother never specifically told me that he was engaged in a scam. But if you compare that testimony with her testimony earlier in the hearing at A-881 through around 897, you'll see a number of times where Dana says, yes, I was being asked to do this. Why did you think you were being asked to do that? I thought it was something about money. Did you think it was strange that I was asking you to communicate with this person in these ways by setting up a post office box, by stopping communication on the defendant's instructions? Yes, I thought it was strange. And the fact that she didn't know the quid pro quo of what the crimes were going to be committed was, that just makes her evidence indirect. It doesn't make it irrelevant to deciding what the defendant's intent was and what was going through his mind in this case. So when you have a defendant who is relying on intent defense and there's one other person who could possibly talk about intent, you need to, as an attorney, perform a reasonable investigation by finding out everything that that witness would potentially say and how they would come across as credible to a jury. And Mr. Burkos never did that in this case. They had a brief conversation that covered a few things about Dana's willingness to testify, the fact that she communicated with Seal, and that she didn't know the specifics of the scam. But Burkos didn't press further, didn't find out about the phone conversations, and wasn't able to really evaluate whether this could be the type of witness who could make the difference in a trial like this one. And this trial was close. This is a case that turns on credibility and intent, one where the government invoked credibility in closing arguments of A665 and 666, and where Burkos, after the fact, said that he thought his client's credibility had shown through well above the government's witnesses, one of whom was testifying to try to get a sentence reduction. So Dana's ability to speak to the issue in this case makes her a critical witness. The decision not to investigate what her testimony precisely would have been and how it would have come across to the jury made it impossible for him to make that choice. And that choice could have made a difference at this trial, which came down to a close call. I see that my time is running short, so I look forward to returning on rebuttal. All right, thank you, Mr. Trombley. Mr. Held. Good morning, Your Honor. May it please the Court, Mr. Hudson doesn't deny that there was overwhelming evidence that he conspired with another prisoner to commit murder and arson for money. He denies the only thing the record permits him to deny, which is his mental state. Counsel, let me back up for one second there. You said overwhelming evidence. There is a lot of evidence that two individuals talked about committing a crime. I don't see the overwhelming evidence regarding Hudson's intent to carry through with the crimes that the State decided to charge. And that goes directly to Strickland's prejudice prong. Am I wrong that the State's case boiled down to which convicted individual who had admitted to lying before they're going to believe? No, Your Honor. The State's case came down to the objective evidence of intent. As the jury was instructed under Wisconsin law, you can't look into somebody's mind to know what their subjective intent is. You have to decide what someone's intent is based on the objective evidence. And so there was overwhelming objective evidence that he was going to commit this crime. He communicated back and forth with Mr. Seale in writing about committing specific murders and a specific arson for money in specific amounts. He continued to communicate with this person who he thought was an attorney while he was in prison and after he got out. He willfully showed up to a meeting and willfully took money to do it. So yes, there was overwhelming evidence of his objective agreement to commit this crime. He, of course, argues that he didn't subjectively agree to commit it in his own mind. Of course, that's something that the government can never directly prove absent somebody's explicit confession. Yes, I subjectively intended to commit this. But he claims that the reason the jury didn't believe his own testimony, that he had no subjective intent, is because his trial attorney didn't call his sister, Dana, to corroborate his theory. And that brings us to something that opposing counsel said in the opening, which is that the only other person who could have spoken to what was going through his mind was Dana. But Dana could not have spoken to what was going through his mind. She couldn't even have spoken to what he told her was going through his mind, because as she testified at the post-conviction hearing, the second post-conviction hearing, she didn't know anything about any scam until after the fact. And she testified that she told attorney Burgos that before the trial or during the trial. So... Can you be more directly responsive to what counsel has argued this morning? And it's in his briefs too, which is, you know, if the central question is whether Hudson is scamming or serious, Dana's testimony is relevant to that. He's argued, you know, it may not be direct. It may be indirect, but it's relevant, for example, because she could speak to how much Hudson didn't like Seal. She could speak to, yeah, I knew my brother was always trying to set up money for us or for me and this kind of after-release plan for us. So can you respond to that specifically? Yes, Your Honor. So she could have corroborated the types of things that Hudson already testified about, which is that he was controlling communications with her. This is what we said in the letters, which Hudson had available to present to the jury. He presented a lot of them to the jury. She could have corroborated, you know, that she wasn't in Chicago. But these were things that weren't really disputed, including the motive for the money. Nobody disputes that Hudson had a motive to obtain this money for him and for his sister. The question is what he was going to do to get it, and the jury didn't believe him when he said he wasn't really going to follow through on these conspiracies to get that money. Other than that, there's hardly anything she could have provided. Maybe she could have talked about the phone calls, but we know from her testimony at the second post-conviction hearing that there's nothing in those phone calls where Hudson told her this is a scam because she said that she told Attorney Burkos before trial that she didn't know anything about a scam. Attorney Burkos testified, and the state court found this credible, that he reviewed the letters before trial, that he spoke to Dana at least once, and Dana testified that she spoke to him at least twice, I think, and that he made his final decision not to call her after all the testimony was in, and Hudson's testimony had gone excellently. Counsel, didn't Judge Peterson point out a bit of a problem with us coming to the same conclusion as the state court regarding the decision not being made until after Hudson testified? Judge Peterson, what Judge Peterson did as far as that, well, first of all, the section 2254 D2 argument is waived, but if it's not waived, as we noted in our brief, the district court's criticism of the state court's factual finding on this point, without even citing to section 2254 E1, might be the reason we're even here on a certificate of appealability. The district court stated that the Wisconsin Court of Appeals arguably constructed a strategic defense for Attorney Burkos, and that doing so would not be a reasonable application of strickland. But the district court's statement here is kind of perplexing because it isn't supported by the record. Dana herself testified post-conviction that she spoke to Attorney Burkos before trial about not knowing anything about a scam, that she'd given him all the letters. Attorney Burkos testified that he always makes the final call on trial, and did so in this case after weighing the benefits and risks. The circuit court thoroughly cited and credited that testimony in its written order, and the Court of Appeals adopted the circuit court's findings. The district court here didn't even bother to cite the federal standard when sort of cavalierly disregarding the state court's findings after the state court sat through this in-person hearing and made credibility findings. So the district court kind of speculated that, well, the state court might have constructed this strategic defense because Dana wasn't on the witness list. But as we noted in our brief, you can still call someone that's not on the witness list if you have good cause. So that was one piece of evidence that could have supported the state court in finding that he wasn't credible. But Judge Peterson certainly didn't make the findings required to find that Attorney Burkos wasn't credible under 2254E1 and Rice and the case law on that. And he noted, he made this sort of a side comment that the district court might have constructed Attorney Burkos' strategic defense form immediately after noting that Attorney Burkos testified to that strategic defense. So in light of the record and the standard of review, the district court's comment here is kind of flabbergasting, honestly. If there are no further questions, Your Honor, I would just ask that the court affirm the district court's ruling. And I would also note, I do want to note for the record that opposing counsel's appendix in this case was excellent. So whoever created it, whether it's opposing counsel or a paralegal, deserves credit for that. And with that, I will just ask that the court affirm. Well, that's awfully kind of you, Mr. Held, and thank you. We think we've got Mr. Trombley coming back up with a little time left. Mr. Trombley, you can have a full minute. Thank you, Your Honor. May it please the court, two brief points. Opposing counsel talked about the objective evidence in this case. We don't think that there's any evidence that is a slam dunk that makes this not the knife-edge case that we described in the opening. We can just look at Mr. Hudson's actions, setting aside all his words. What did he do when he went to the meeting where he was supposedly agreeing to go kill someone? He refused to take the addresses at first and attempted to hand them back. He repeatedly refused a ride to the location where the crimes were going to be carried out. And when he was arrested, he didn't have any weapons, he didn't have any tools, he didn't have any maps to show how he was going to go and do the heinous things that he had supposedly agreed to do. We don't think there's any objective evidence there. Briefly on the point about when counsel made the decision, we point you to Wiggins v. Smith again from 529 to 533. You have similar discussion by the Supreme Court about what do you make of an attorney's testimony after the fact that makes their decision sound strategic. Here, we're not saying that Mr. Burkus was lying, but we are saying that the evidence at the time of trial, was he on the witness list or was Dana on the witness list, all of those things should be credited above something he said 14 years later. Thank you, Your Honors. Thank you. And we want to thank counsel for Mr. Hudson for taking the appointment. In this case, we appreciate your service. We thank both the parties. With that, we'll take the appeal under advisement and adjourn for the day.